**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Circuit Judge Timothy M. Tymkovich**

Civil Action No. 1:19-cv-00170-TMT-KAS

JOEL SCOTT and CARON SCOTT,

     Plaintiffs,

v.

THE BUCKNER COMPANY,

     Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO STRIKE\***

---

This case arises from damage sustained to Joel and Caron Scotts' home during construction. After the Scotts' contractor, Silverhawk Enterprises Inc.'s, insurer disclaimed coverage, the Scotts sued Silverhawk. The Scotts partially recovered from Silverhawk, but the terms of their settlement included Silverhawk assigning its claims against its procuring insurance agent—the Buckner Company—to the Scotts.

---

\* This case was originally assigned to then-Magistrate Judge Nina Y. Wang. Dkt. 3. Because all parties did not consent to Magistrate-Judge jurisdiction, the case was reassigned to Judge Wiley Y. Daniel. Dkt. 18. Judge Daniel exercised his prerogative as a Senior Judge to return the case. Dkt. 19. The case was then randomly assigned to Judge William J. Martinez, dkt. 20, and then to Judge Daniel D. Domenico. Dkt. 50. After Buckner filed its Motion for Summary Judgment, dkt. 66, Chief Judge Brimmer reassigned this case to Tenth Circuit Judge Timothy M. Tymkovich. Dkt. 97.

The Scotts then filed four claims against Buckner.  Claim 1 is for negligent misrepresentation between the Scotts and Buckner.  The remaining three claims are the Silverhawk assigned claims: (2) negligent failure to procure insurance, (3) breach of an oral contract to procure insurance, and (4) negligent misrepresentation.

After discovery closed, Buckner moved for summary judgment on all claims and to strike the Scotts' insurance expert, Michael A. Rodman.  Dkts. 66, 69.  For the following reasons, we grant summary judgment for Buckner and grant in part and deny in part Buckner's motion to strike the expert witness.

## I.  Background

### A. Buckner & Silverhawk

Silverhawk is a general contractor incorporated under the laws of Utah.  Dkts. 66 at 3; 80 at 2.  Tom Hasleton was at all relevant times Silverhawk's principal.

The Buckner Company is a licensed insurance agency.  Dkts. 66 at 3; 80 at 4.  It is incorporated under the laws of Utah and has its principal place of business in Salt Lake City, Utah.  Dkts. 66 at 3; 80 at 2.  Beat Koszinowski is a Buckner employee located in Utah.  Mr. Koszinowski is a licensed insurance agent under Utah law.  Dkts. 66 at 3; 80 at 3.

Beginning in 2006 and continuing through 2015, Mr. Koszinowski worked with Silverhawk to procure Commercial General Liability (CGL) policies from an insurer called Mid-Continent.  Dkts. 66 at 3; 80 at 3.  These policies renewed annually on March 15.

Every CGL policy Buckner procured for Silverhawk contained these four exclusions:

> (1) Exclusion - Designated Work — Construction Operations in various states (including Colorado) as respects Products and Completed Operations;
>
> (2) Exclusion - Designated Ongoing Operations — in various states including Colorado;
>
> (3) Exclusion for Exterior Insulation and Finish System (EIFS)[1] for property damage; and
>
> (4) CG2294 - Exclusion for damage to your work or work by subcontractors.

Dkts. 66 at 4; 80 at 3 (undisputed fact 9).

Silverhawk was objectively aware that the CGL policies contained at least exclusions 3 (EIFS) and 4 (subcontractor).   Indeed, a Buckner "Contractors Questionnaire" dated "6/6/08" and signed by Mr. Hasleton includes the bullet point "TALK ABOUT EXCLUSIONS SUBSIDENCE, EFIS [sic], MOLD, PROFESSIONAL LIABILTY, ROOFING, SUBCONTRATROS [sic] DAMAGE TO YOUR WORK (CG 2294)." Dkt. 80-22 at 7.   Next to this bullet is written "yes" and at the bottom of the page is Mr. Hasleton's handwritten initials.   *Id.*; *see also id*. at 3 ("11/20/07" "Renewal").[2]

Along with the CGL policies, Buckner procured a "blanket builders risk/course of construction" property insurance policy for Silverhawk.   Dkt. 80-10.   The Property

---

[1] EIFS is "commonly referred to as synthetic stucco."  Dkt. 77-4 at 12.

[2] Compare the initials in dkt. 80-22 with Mr. Hasleton's in dkt. 66-2.

Insurance policy and CGL policies are distinct policies providing distinct coverages. At the time the Scotts' loss occurred (October 2014), Silverhawk had in place both a CGL policy and a Property Insurance policy procured by Buckner.

### B. Silverhawk & The Scotts

On April 10, 2012, Joel Scott and Caron Scott contracted with Silverhawk to build them a home in Salida, Colorado. Dkt. 66-2. The contract between them provided that "[b]oth the Buyer and the Contractor will carry necessary insurance coverages (Home Owner's, General Liability, Workers Compensation and Hazard) through the building process." *Id*. ¶ 18.

Around July 2012, Mr. Hasleton claims to have called Mr. Koszinowski requesting "full coverage for a project that [Silverhawk] was going to be building in Colorado that would cost about $750,000." Dkt. 80 at 3. The following affidavit and deposition testimony from Mr. Hasleton reflects the totality of record evidence regarding this alleged conversation:

> I called my agent Beat Koszinowski at Buckner. I told him that I was going to be doing a project in Colorado that would be around $750,000 to build and I wanted to make sure that we were *fully covered* for the work.
>
> We are a Utah based company so in the past I had talked to Beat about insurance when we did work in Wyoming and Idaho . . . On those other occasions I called Beat and said basically the same things – "hey, we're going to be doing some work in Wyoming with some house in a development and I wanted to check on insurance for that" – then Beat asked some questions about the kind of work and the costs of the homes, and said there was no problem with that . . . I don't recall the exact sentences that we spoke about the Scott project or in what order, but his reaction to me was something along the lines of "yeah Tom, we'll get that

4

> taken care of" or "you're good there." Very similar to what he said before. Whatever the words were exactly they left me with the understanding that the Scott project would be covered by liability insurance along with the builder's risk insurance, which are two kinds of policies that I've been told by Beat we needed to have for the company. I assumed that the policies already in place when Scott came up may actually be enough with possibly some changes to them and that Beat would tell me if we needed to do something more.

Dkt. 80-3 at ¶ 2–4 (emphasis added).

> And when I call and say I need coverage, at that point we're assuming that it's going to be similar to what we have on every other house that we're doing and have done for the many years that we've done business. This wasn't our first time. We even had the bank call and say they need X amount of coverage. So we assumed that both the GL and the builder's risk was covered.

Dkt. 66-5 147:6–16.

Buckner disputes that this conversation took place. *See, e.g.*, Dkt. 82-3 138:6–15. But Buckner did in fact learn of the Scott project because, on October 17, 2012, Buckner sent Silverhawk evidence of the *Property Insurance* policy, noting "attached is a certificate of insurance for the home being built in Salida, CO." Dkt. 80-6. Buckner alleges that the Scotts' bank, not Silverhawk, informed it of the project. Dkt. 82-3 at 140:11-15 ("somewhere in October of 2012 somebody contacted our office, it appears to me it was the lender, the bank, of – of the Scotts, when I look at the information, a request to be added, a project in Colorado."). Mr. Hasleton also testified that the bank called Buckner about the Scott project. Dkt. 66-5 147:13–14 ("We even had the bank call and say they need X amount of coverage.").

That same day, Joel Scott and Silverhawk also corresponded by email:

> Joel Scott: "[I]s your agent clear on what is needed?"

5

> Silverhawk: "Yes, she just sent a copy.  We just received it
> from the agent."

Dkt. 80-6.

The "copy" Silverhawk was referring to was the updated *Property Insurance* policy.  And after this email exchange, Silverhawk sent that document to Joel Scott. *Id.*  This Property Insurance document listed the Colorado "Project location," the loan amount for $750,000, Joel Scott as an "additional interest," and is dated October 17, 2012.  Dkt. 80-8 at 4.

Also that same day, Bucker provided Silverhawk a "policy changes" document reflecting an endorsement for the Property Insurance policy.  This endorsement added Colorado as a work location.   Dkt. 80-7 ("JOBSITE DESCRIPTION IS AMENDED TO INCLUDE COLORADO.").  It also provides:

> Description and location of covered construction premises:
> new construction and remodel of one to six family dwellings
> and light commercial at various limits and locations within
> the states of Utah, Wyoming and Colorado *as reported to
> the company* on a monthly basis.

*Id.* at 2 (emphasis added).

To summarize, despite updating the *Property Insurance* policy to reflect the Scott project, Buckner never altered the existing *CGL* policy—exclusions 1 and 2 of which categorically precluded coverage for projects in Colorado (the Colorado Exclusions).  Dkt. 77-2 at 2.

Silverhawk never reported starting the Scott project to Buckner or Mid-Continent, dkt. 82-5, but in fact began construction in or around November 2012.

6

Dkts. 80 at ¶ 12, 82 at ¶ 12. The Scotts allege that the construction team comprised Silverhawk, subcontractors hired by Silverhawk, and subcontractors hired directly by the Scotts. Dkt. 80 at 3. The record, however, indicates that "[a]ll work was subcontracted by Silverhawk." Dkts. 77-3 at 2; 77-2 at 2; *see also* Dkt. 77-4 at 26.

Construction did not go smoothly. According to the Scotts, "at numerous times during construction [we] notified Hasleton and/or Silverhawk of construction defects which they failed to rectify and/or fix." Dkt. 77-3. On October 3, 2014, the Scotts commissioned an "EIFS Inspection" directed at these defects. Dkt. 77-4. The EIFS Inspection Report concluded, among other things, that "[t]he various installation contractors' failure to comply with the manufacturers' installation specifications has resulted in the need for repairs" due to "[m]oisture intrusion." *Id.* at 26.

After receiving the EIFS Inspection report, the Scotts filed a claim under Silverhawk's *CGL* policy with a reported loss date of October 4, 2014 (the day after the EIFS Inspection). Dkt. 77-2. They did *not* file a claim under the *Property Insurance* policy. Their claim sought coverage for the "repair of the problems as outlined in the [EIFS] inspection report." Dkt. 77-2 at 3.

On May 29, 2015, Mid-Continent disclaimed coverage, citing as independent bases the no-Colorado work, EIFS, and subcontractor work exclusions. Dkt. 77-2. It is unclear whether the Scotts or Silverhawk disputed this denial.

### C. Procedural History

After receiving the denial, the Scotts sued both Silverhawk and Mr. Hasleton, asserting claims for negligence, breach of express and implied warranties, and breach of contract.  Dkt. 77-3 at ¶¶ 22–49.  Mr. Hasleton and Silverhawk settled the claims by paying the Scotts $97,500—representing about half of their out-of-pocket expenses spent repairing their home—and assigning any valid claims against Buckner to the Scotts.  *Id.* at ¶ 17.

On January 18, 2019, the Scotts sued Buckner, asserting three Silverhawk assigned claims: (1) breach of a contract to procure insurance, (2) negligent misrepresentation, and (3) negligent failure to procure insurance.  Dkt. 1.  They also asserted one direct claim for negligent misrepresentation.  *Id.* at ¶¶ 21–44.  The Scotts seek to recover their remaining $115,397 in out-of-pocket expenses spent repairing their home, as well as their $88,000 in legal fees spent suing Silverhawk.  *Id.* at ¶¶ 27, 16.

Early in the litigation Buckner moved to dismiss for improper venue, which the court denied.  Dkts. 14, 49.  After discovery closed, Buckner moved for summary judgment on all the Scotts' claims and to strike the Scotts' expert witness, Michael Rodman.  Dkts. 65, 66, 69.  These motions were fully briefed as of March 27, 2020.  The court considers each in turn.

## II.   Motion for Summary Judgment

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a). "In applying this standard, we view the facts and any reasonable inferences in the light most favorable to the non-moving party." *Arnold v. City of Olathe*, 35 F.4th 778, 788 (10th Cir. 2022).

"An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Id.* "If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial." *Id.*

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Id.* at 670–71. A movant that "will not bear the burden of persuasion at trial need not negate the nonmovant's claim"—rather, it "may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671.

"If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (internal quotation omitted).

## ANALYSIS

Buckner moves for summary judgment as to all asserted claims. It also seeks a substantive law determination for the Scotts' direct negligent misrepresentation claim. The Parties do not dispute, and the court agrees, that Utah law governs the Scotts' assigned claims.

As the court explains below, Buckner is entitled to summary judgment on all the Scotts' asserted claims.

### A. The CGL Exclusions & The Scotts' Claimed Damages

As relevant here, the CGL policy precluded coverage for Colorado work, for EIFS property damage, and for damage done by subcontractors. Dkts. 66 & 80 (undisputed fact 9). And in its coverage denial letter, Mid-Continent primarily relied on these exclusions to disclaim coverage. Dkt. 77-2 at 2. The denial letter, however, does not specify whether each exclusion was *independently* sufficient to preclude coverage. This is significant: if the exclusions independently preclude coverage, then the Scotts must prove Buckner's malfeasance as to each exclusion to sustain their claims.

There is no reasonable dispute that the Colorado work exclusions preclude coverage for the Scotts' claims. *See, e.g.*, Dkt. 66-6 at 10 (Excluding "All construction operations" in "CO"). Thus, the court first undertakes to determine whether the EIFS and subcontractor exclusions individually preclude coverage.

### 1. *EIFS Exclusion*

The EIFS exclusion precludes "Property Damage" arising out of the "Exterior Insulation and Finish System Hazard." *Id.* at 12. "Exterior Insulation and Finish System Hazard" means:

> The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling service, correction, or replacement, of an "exterior insulation and finish system" (commonly referred to as synthetic stucco) or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulkings or sealants in connection with such a system when performed by you or on your behalf; or
>
> *Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system" is used on any part of that structure when performed by you or on your behalf.*

*Id.* (emphasis added).

Mid-Continent's denial letter explains that the claim "is asserted against Silverhawk Enterprises, Inc. *for repair of the problems as outlined in the Aspen Home Inspection Services, LLC inspection report.*" 77-2 at 3 (emphasis added). That report is titled the "SCOTT EIFS INSPECTION REPORT." 77-4 at 1. And the introduction to the report notes "PURPOSE:  Enclosed is your Stucco Moisture inspection.  The purpose of this moisture inspection is to help assess the condition of the stucco system[.]" *Id.* at 3.

The Scotts point to no evidence from which the court could reasonably infer that their damages are not EIFS related.  The Scotts only briefly address their

claimed losses in the "FACT" section of their summary judgment response brief, stating "[t]he damage to the Scotts' home at issue in Chaffee County Civil Case No. 2015-cv-30039 (the "Underlying Lawsuit") was alleged to be the result of work done by Silverhawk, its subcontractors, and a contractor hired by the Scotts, and the faulty work resulted in other damage to the home." Dkt. 80 at 3–4.

The Scotts cite four documents allegedly supporting these claimed damages. Two of these are pleading documents from their underlying lawsuit against Silverhawk and allege the following damage to their home:

a. Moisture leak in the Master bedroom closet under the stairs;
b. Failure to install and/or properly install EDPM;
c. Damaged installed EDPM;
d. Moisture intrusion into vertical sheathing;
e. Improper installation of the stucco throughout the property;
f. Improper installation of the imitation stone veneer;
g. Improper flashing at and on the parapet walls;
h. Improper installation of the weather proofing at and around all penetrations for windows, and
i. Improper installation of fireplace inserts.

Dkts. 77-3 and 80-4.

These allegations are pleadings in a separate lawsuit and, unsupported by evidence, they cannot defeat summary judgment. *Adler*, 144 F.3d at 671. But even taking them as true, and perhaps except for the "fireplace inserts," all of this damage was caused by, or related to, moisture intrusion stemming from the improperly installed EIFS system. Dkt. 77-4.

The Scotts' other two record cites fare no better. Indeed, one is the EIFS inspection report just discussed. Dkt. 77-4. Both substantively and on its face, the EIFS Inspection Report supports finding that the claimed damages are EIFS

12

damages, and so not covered.  Dkt. 66-6 at 12.  The Scotts' final record cite is to a selected portion of Mr. Hasleton's deposition:

> Q. Did Silverhawk Enterprises self-perform any of the work on the project?
> A. Yes, they did.
> Q. Do you recall what you self-performed?
> A. Some things.
> Q. Okay.  Anything exactly?
> A. We did the – we did the footing and foundation, I believe we did the flatwork.  We did the finish carpentry.  That's all I can remember.
> Q. Okay.  How about anything regarding the building envelope?
> A. We did the stairs that – let's see.  Let me think – we did the topical application of the stairs, I think, but I don't remember how much . . . .
> Q. Is that installing, like, the tread?
> A. Tread caps, yes.  We didn't do anything else.  But we did – I believe we did cut and install the tread caps.

Dkt. 66-5 at 54:18–55:22.

This excerpt merely demonstrates that Silverhawk *may* have performed some work on the home—but it does nothing to alter the conclusion that the Scotts' *claimed damages* were precluded by the EIFS exclusion.  Dkt. 66-6 at 12 (excluding "[a]ny work or operations *with respect to any exterior component, fixture or feature* of any structure if an exterior insulation and finish system is used on any part of that structure when performed by you or on your behalf.").[3]

## 2. Subcontractor Exclusion

Beyond the EIFS exclusion, the subcontractor work exclusion also precludes the Scotts' claimed damages.  This exclusion provides: "[t]his insurance does not apply

---

[3] The subject "stairs" are on the outside of the home.  *See, e.g.*, Dkt. 77-4 at 22.

to: I. Damage To Your Work [--] 'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" *Id.* at 38. "Your work" means "*work or operations performed by you or on your behalf*[.]" *Id.* (emphasis added). The "Products-completed operations hazard" also excludes coverage for "completed or abandoned" work. *Id.* at 29.[4]

As Mid-Continent's claims denial letter explained, this endorsement "excludes your work product or the work product of a subcontractor . . . The property damage claimed is to the work performed by Silverhawk Enterprises, and/or a subcontractor on their behalf; therefore the policy does not provide coverage for this loss." Dkt. 77-2 at 2, 4. The Scotts have not identified evidence permitting a contrary conclusion.[5] *Adler*, 144 F.3d at 671.

At bottom, the Scotts have not come forth with evidence sufficient to refute Buckner's contention that all their claimed damages were independently excluded by either or both of the CGL policy's EIFS and subcontractor work exclusions. Dkt. 82 at 2. Because these exclusions support denying coverage independent of the Colorado

---

[4] The CGL policy defines work as completed when "that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project. Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." *Id.* at 30.

[5] The claims denial letter also explained that the CGL policy precluded coverage for: (1) "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the property damage arises out of those operations" and (2) "[t]hat particular part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it[.]" 77-2 at 4. These exclusions also preclude all the Scotts' claimed damages.

14

Exclusions, dkt. 77-2, the next question is whether Buckner bears any liability in connection with the CGL policy having contained these independent bases for denial.

### B. Assigned Claims

The court next considers in turn the Scotts' assigned claims for: (1) breach of an oral contract for failure to procure insurance, (2) failure to procure coverage, and (3) negligent misrepresentation.  Utah law applies to all these claims.

#### 1. Breach of Contract

The Scotts allege that the purported phone call between Mr. Hasleton and Mr. Koszinowski resulted in a contract to procure "full coverage" insurance for the Scott project.[6]  Buckner disputes this conversation occurred but argues that, even assuming it did, the Scotts' breach claim fails as a matter of law because no record evidence shows a meeting of the minds.

In Utah, whether a valid contract exists is a question of law.  *Harris v. Albrecht*, 86 P.3d 728, 730 (Utah 2004).  But whether the parties had a meeting of the minds is a fact question.  *Terry v. Bacon*, 269 P.3d 188, 192 (Utah Ct. App. 2011).  "Under general contract law, it is fundamental that there be a meeting of the minds as to all essential features of a contract."  *Id.* at 195.

An oral "contract to procure insurance may arise when the agent has definite directions from the insured to consummate a final contract, when the scope, subject

---

[6] To the extent "full coverage" is an industry term of art, neither party has briefed it.  But since no insurance policy provides 100% coverage in all scenarios, the court does not construe "full coverage" as being *complete* coverage, but as adequate coverage, the parameters of which are subjectively defined by the parties' expectations.

matter, duration, and other elements can be found by implication, and when the insured gives the agent authority to ascertain some of the essential facts." *Harris*, 86 P.3d at 731. An "express agreement is not necessary; the scope of the risk, the subject matter to be covered, the duration of the insurance, and other elements can be found by implication." *Id.*

The *Harris* court based its analysis on an Oregon case, *Hamacher v. Tumy*, 352 P.2d 493, 497 (1960), which concluded that an oral contract to procure insurance existed. *Harris*, 86 P.3d at 731 (discussing *Hamacher*, 352 P.2d at 498). Applying *Hamacher*, however, the *Harris* court reached the opposite conclusion. Critically, it reasoned the agent "could not identify the scope of the risk, the subject matter to be covered, the duration of the insurance, and other elements . . . by implication." *Id.* at 732 (internal citations omitted). Moreover, the plaintiff "failed to give authority for [the agent] to ascertain some of the essential facts" and "merely made a general request for insurance". *Id.* At bottom, "too many variables remained." *Id.* at 732 (*cf. Hamacher*, where "the sawmill owner already had policies with the agent, the additional coverage was based upon existing policies, the appraisal gave the agent the requisite information to add the additional coverage, and the parties specifically discussed different fire coverages.").

Relying solely on Mr. Hasleton's testimony and affidavit, the Scotts assert:

> Silverhawk communicated to Buckner that Silverhawk wanted *full coverage* for a project that it was going to be building in Colorado that would cost about $750,000. Buckner responded to the effect that it would be taken care of or it was good. Silverhawk had made similar requests in

the past for Wyoming and Idaho that were handled similarly.

Dkt. 80 at ¶ 10 (emphasis added).

Presumably because the conversation evidence is scant on specifics, the Scotts argue that essential terms of the contract can be inferred by Silverhawk and Buckner's prior dealings in Wyoming and Idaho. Dkt. 80 at 17. Nevertheless, the court concludes that no contract to procure insurance was formed both because no reasonable jury could find that there was a meeting of the minds and because the alleged contract otherwise lacked essential features of a final contract to procure.

As to the former, Silverhawk and Buckner could not have had a meeting of the minds as to the term "full coverage." *Harris*, 86 P.3d at 731 ("[S]cope" is an "essential" term of a contract to procure insurance). The Scotts' claim is cognizable only if Silverhawk understood a "full coverage" policy as *excluding* the EIFS and subcontractor work exclusions, since those exclusions independently preclude coverage. Yet Buckner did not interpret "full coverage" this way since it understood the EIFS and subcontractor exclusions to be "standard exclusions in commercial general liability insurance policies." Dkt. 69 at 4. Given that Silverhawk's interpretation of "full coverage" necessarily *excluded* the EIFS and subcontractor work exclusions, and Buckner's *included* them, Silverhawk and Buckner did not have a meeting of the minds regarding the scope of coverage—an essential term of a contract to procure insurance. *Harris*, 86 P.3d at 731.

Nor can Silverhawk and Buckner's prior dealings relating to Wyoming and Idaho projects serve as a gap filler for this term. Dkt. 80 at 17. To be sure, "[p]revious

dealings between the parties are the strongest and, in most instances, the most definite basis for implying terms of a contract." *Harris*, 86 P.3d at 732. But the prior dealings fail to do so because it is undisputed that *all* Silverhawk's prior CGL policies contained the same exclusions that precluded coverage here. Mr. Hasleton even attested he "assum[ed] it's going to be similar to what we have on every other house that we're doing and have done for the many years that we've done business." 66-5 147:6–16. Since the Scotts necessarily must argue that the alleged contract to procure sought a policy *omitting* those exclusions, prior dealings do not help them.[7] *Harris*, 86 P.3d at 732 ("[P]rior dealings are supportive only to the degree that they supply essential elements from which the agent can complete an insurance contract.").

And beyond scope, other reasons support concluding that Buckner and Silverhawk did not form a contract. For one, besides "merely ma[king] a general request for insurance," *id.*, nothing suggests that Silverhawk gave Buckner "definite directions . . . to consummate a final contract". *Id.* at 731. Rather, Silverhawk generally inquired about insurance and then "assumed that the policies already in place [] may actually be enough with possibly some changes to them and that Beat would tell me if we needed to do something more." Dkt. 80-3 at ¶ 2–4. Nor did this

---

[7] The prior CGL policies also included the Colorado Exclusions. And since neither Idaho nor Wyoming appeared on the CGL's "designated work" exclusion schedule, dkt. 77-2 at 12, Buckner could not have handled work in those states "similar" to how the Scotts allege it should have handled work in Colorado—meaning, again that prior dealings do not inform the scope of coverage.

alleged conversation touch on the type of casualty, duration of the policy, or effective start date. *Cf. Harris*, 86 P.3d at 731–32.[8]

In sum, Silverhawk and Buckner's alleged conversation, conduct, and prior dealings simply leave "too many variables" for the court to conclude that an oral contract to procure the *precise* insurance the Scotts would ultimately need for its claims to succeed existed. *Harris*, 86 P.3d at 731. Because no contract existed, Buckner is entitled to judgment on the Scotts' breach of contract claim.[9]

---

[8] Nor did Silverhawk give Buckner "authority to ascertain" the existence of essential facts, including the object of coverage. *Id.* at 731. Indeed, the record shows that Silverhawk reported no "new starts" in Colorado, or otherwise, *ever*. Dkt. 82-5. Since the project self-reporting forms affirmatively represented to Buckner that Silverhawk had *not* started any new projects, Buckner lacked authority to ascertain the existence of the Scott project or when construction began. In fact, because Silverhawk never reported starting the Scott project, it never incurred a premium for the Property Insurance policy that Buckner updated to reflect the project. Dkt. 82-3 at 137–138.

[9] Even assuming the contract did exist, Buckner would still be entitled to summary judgment on the Scotts' breach claim. This is because the only plausible construction of this "contract" would be for it to require Buckner to procure a CGL policy omitting the Colorado work exclusions (since those exclusions preclude coverage), but still containing the EIFS and subcontractor work exclusions, which all the prior CGL policies contained. Because this policy still would have independently precluded coverage for the Scotts' claimed losses under the EIFS and subcontractor work exclusions, that policy would leave them with no damages upon which to sustain the claim. *Anesthesiologists Assocs. of Ogden v. St. Benedict's Hosp.*, 884 P.2d 1236, 1238 (Utah 1994) ("Damages awarded for breach of contract should place the nonbreaching party in as good a position as if the contract had been performed.") (internal quotations omitted). And if a contract existed, the Scotts' assigned tort claims are likely barred by Utah's application of the economic loss doctrine because *See SME Indus. Inc. v. Thompson, Venulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 680–84 (Utah 2001); Dkt. 80 at 10 ("The jury must first find that a contract to procure existed between Buckner and Silverhawk before the economic loss rule would bar any tort claims which are asserted in the alternative.").

## 2. *Failure to Procure Coverage*

Having concluded that Buckner had no contractual duty to procure insurance, the court next considers whether Buckner assumed a duty enforceable in tort law to do so.  Dkt. 80 at 3.

In Utah, courts consider the totality of the circumstances to determine whether an insurance agent has assumed a duty to procure insurance:

> [A] court must look to the conduct of the parties and the communications between them, and more specifically to the extent to which they indicate that the agent has acknowledged an obligation to secure a policy.  Where an insurance agent or broker promises, or gives some affirmative assurance, that he will procure or renew a policy of insurance under circumstances which lull the insured into the belief that such insurance has been effected, the law will impose upon the broker or agent the obligation to perform the duty which he has thus assumed.  Further, if the parties have had prior dealings where the agent customarily has taken care of the customer's needs without consultation, then a legal duty to procure additional insurance may arise without express and detailed orders from the customer and acceptance by the agent . . . . [A]n application from the customer is sufficient to support a duty to procure insurance.  A bare acknowledgment of a contract to protect the insured against casualty *of a specified kind* until a formal policy can be issued is enough . . . .

*Harris*, 86 P.3d at 732–33 (quoting *Alford v. Tudor Hall & Assocs., Inc.*, 330 S.E.2d 830, 832 (N.C. Ct. App. 1985)) (emphasis added).  The existence of a duty is a question of law.  *Id.* at 730.

As above, because Buckner disputes whether the Hasleton-Koszinowski conversation took place, the court assumes it did.  And assuming it did, the court must determine whether—taking the alleged conduct and communications of

Buckner and Silverhawk as true—Buckner incurred a duty to procure a CGL policy omitting the EIFS and subcontractor work exclusions.

Both parties argue *Harris* supports their respective positions.  But "*Harris* stands only for the proposition that an insured is entitled to the insurance it has requested." *Am. Loans, Inc. v. Arthur J. Gallagher & Co.*, 2020 WL 1473995, at *3 (D. Utah Mar. 26, 2020).  Thus, the threshold question is whether Silverhawk *requested* a CGL policy omitting the EIFS and subcontractor work endorsements.  *See also Asael Farr & Sons Co. v. Truck Ins. Exch.*, 193 P.3d 650, 661 (Utah App. Aug. 28, 2008) ("Reed had no duty to procure insurance for more than Dexter Farr requested or to analyze Farr's comprehensive insurance needs under the facts of this case.").[10]

*American Loans* is analogous to the facts presented here.  There, the question was whether an insurance agent assumed a duty to procure insurance when the insured requested "whatever insurance [it] needed." 2020 WL 1473995, at *3. "Whatever insurance [it] needed" was what Silverhawk was looking for here:

> Whatever the words were exactly they left me with the understanding that the Scott project would be covered by liability insurance along with the builder's risk insurance, *which are two kinds of policies that I've been told by Beat we needed* to have for the company.  *I assumed that* the policies already in place when Scott came up may actually be enough with possibly some changes to them and that *Beat would tell me if we needed to do something more.*

Dkt. 80-3 at ¶ 2–4 (emphasis added).

---

[10] The court likewise concludes that Buckner had no duty to analyze Silverhawk's insurance needs either before or after the alleged conversation.  *Infra* (II)(B)(3).

But as the *American Loans* court explained:

> American Loans did not specifically request personal liability insurance; it requested only that Gallagher secure whatever insurance American Loans "needed." And both Mr. Moore and Mr. Llavina testified that "needed" in this context referred to meeting the requirements of NattyMac, which would not include professional liability insurance.
>
> While Mr. Llavina also testified that he believed this meant he would be getting some type of negligence coverage, there is no evidence that this belief was communicated to Mr. Moore or anyone else at Gallagher. On the contrary, Mr. Llavina's testimony is that he did not understand what was or was not covered by E&O insurance or professional liability insurance. Given this admission, it is not clear how American Loans could have conveyed to Gallagher with sufficient direction that it expected Gallagher to bind professional liability coverage for it. Moreover, the parties had no prior dealings from which Gallagher could infer what American Loans wanted. And there is no evidence that Gallagher told American Loans that it would be binding professional negligence coverage.
>
> In sum, Gallagher procured the insurance that American Loans had requested. It had no duty to go beyond that request. Accordingly, American Loans' claim for failure to procure insurance must fail.

2020 WL 1473995, at *3–4.

So too here. The only record evidence the Scotts offer that Silverhawk requested a CGL policy without the EIFS and subcontractor work exclusions is the Hasleton affidavit and testimony that Silverhawk be "fully covered." But for the reasons explained in *supra* (II)(C)(1), the court concludes Mr. Hasleton's request to be "fully covered" is insufficiently specific to conclude that Silverhawk was presently

requesting a policy omitting the EIFS and subcontractor work exclusions.   *See American Loans¸* 2020 WL 1473995, at *3–4.[11]

Absent a specific instruction to procure a policy without the EIFS and subcontractor work exclusions, Bucker had no duty to procure such a policy, and Buckner is entitled to summary judgment on this claim.

### 3. Negligent Misrepresentation

The Scotts' final assigned claim is for negligent misrepresentation.

> A claim for negligent misrepresentation requires a party to demonstrate that (1) a party carelessly or negligently makes a false representation "expecting the other party to rely and act thereon," (2) the plaintiff actually relies on the statement, and (3) suffers a loss as a result of that reliance. "[I]n addition to affirmative misstatements, an omission may be actionable as a negligent misrepresentation where the defendant has a duty to disclose."

*Moore v. Smith*, 158 P.3d 562, 574 n.12 (Utah Ct. App. 2007) (quoting *Smith v. Frandsen*, 94 P.3d 919, 922–23 (Utah 2004)) (citations omitted).

---

[11] While the *Harris* court outlined four factors to help determine when a "duty to procure insurance may arise," *Harris*, 86 P.3d at 735, the court finds it unnecessary to consider those factors in detail since it has already concluded Silverhawk failed to give Buckner "sufficient instructions to impose a duty to procure insurance" when "the missing terms could not be implied from the parties' prior dealings." *Id.* at 734. Notwithstanding, those factors are: [1] whether "an agent accepts an application;" [2] "makes a bare acknowledgment of a contract covering a specific kind of casualty;" [3] "lulls the other party into believing a contract has been effected through promises;" and [4] "has taken care of the insured's needs without consultation in the past." *Id.* at 735. The Scotts' claim also fails under these factors at least because there is no evidence Buckner acknowledged "a specific kind of casualty[.]" *Id.*

Although the Scotts frame their claim as one for negligent misrepresentation, "[t]here are no substantive differences between [a negligent misrepresentation claim] and [a] duty to advise claim". *American Loans*, 2020 WL 1473995, at *6. And since the Scotts substantively allege that Buckner failed to take affirmative steps to advise about or mitigate the CGL policy's exclusions, the court analyzes this claim under a failure to advise framework.

All tort claims require a duty, and the existence of a duty is a question of law. *Harris*, 86 P.3d at 730. "Utah law strongly implies" that there is no "fiduciary-like obligation to give advice to a client." *American Loans*, 2020 WL 1473995, at *4; *id.* at *3 ("*Harris* stands only for the proposition that an insured is entitled to the insurance it has requested."); *see also Asael Farr*, 193 P.3d at 661–62 (holding that *Harris* did not impose a duty to advise on insurance agents); *Allegis Inv. Servs., LLC v. Arthur J. Gallagher & Co.*, 371 F. Supp. 3d 983, 1005 (D. Utah 2019) (declining to find a fiduciary relationship between an agent and insured plaintiff because "Utah courts have reserved findings of fiduciary duties to relationships that evince a higher degree of trust than ordinary agency relationships.").

Notwithstanding, as the Scotts recognize, in *Asael Farr* the Utah Court of Appeals did not explicitly foreclose the possibility that, under different facts, an insurance agent *could* be liable for failing to properly advise a client as to a policy's exclusions. 193 P.3d at 660–61. But courts "typically hold that insurance agents have fiduciary-like duties to their insureds only if they have a 'special relationship'

with their client that goes beyond the typical agent-client relationship." *American Loans*, 2020 WL 1473995, at 4.

As the Tenth Circuit has explained in an analogous context:

> [T]he general rule [is] that insurance agents have a duty to act with reasonable care toward their insureds, but, absent a special relationship between the insured and the insurer's agent, that agent has no affirmative duty to advise or warn his or her customer of provisions contained in an insurance policy . . . . Whether a special relationship has been formed turns on whether there is "entrustment," that is, whether the agent or broker assumes additional responsibilities beyond those which attach to an ordinary, reasonable agent possessing normal competencies and skills.

*Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1171 (10th Cir. 2008) (internal quotations and citations omitted).

This "special relationship" approach is consistent with the law followed in most other states. *See, e.g.*, *Murphy v. Kuhn*, 682 N.E.2d 972, 976 (N.Y. 1997) ("[I]t is well settled that agents have no continuing duty to advise, guide, or direct a client to obtain additional coverage . . . . Insurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status.") (internal citations omitted); *N. Cypress Med. Ctr. Operating Co. v. Gallagher Ben. Servs., Inc.*, 2011 WL 5110456, at *3 (S.D. Tex. Oct. 24, 2011) ("[A]dditional duties between brokers and their clients, however unusual, may arise depend[ing] on the facts surrounding the relationship between the insured and the agent or broker, and especially when the parties have a long-term relationship with high levels of trust.") (internal quotations omitted); *Van Den Heuvel v. AI Credit Corp.*, 951 F. Supp. 2d 1064, 1080 (E.D. Wis.

2013) ("[A]bsent special circumstances, an insurer and its agents owe limited duties to the insured.  For example, insurers do not have an affirmative duty to advise the insured regarding the availability or adequacy of coverage.  Only where a statutory obligation or a special relationship exists will a duty arise.") (internal citations omitted).

Despite citing no Utah authority finding either a special relationship or the existence of a duty to advise clients regarding policy exclusions, the Scotts urge that both existed here because: (1) "Buckner and Mr. Koszinowski hol[d] themselves out as having expertise in CGL and other policies pertaining to the construction industry [and] Silverhawk relied on that expertise"; (2) Buckner had "undertaken efforts to evaluate its client's coverage needs"; and (3) "Buckner and Silverhawk had a seven-year relationship at the time the request was made."  Dkt. 80 at 6 ¶ 24; *id.* at 19–20.[12]

This does not suffice to establish a special relationship or tort duty for at least three reasons.  *First*, "entities seeking to purchase insurance are almost always going

---

[12] The Scotts frame the issue as being whether Buckner had a duty "to procure a policy for Silverhawk that did not include a Colorado-work endorsement . . . ."  Dkt. 80 at 18.  But as already discussed, because coverage was independently precluded under the EIFS and subcontractor exclusions, the relevant inquiry is whether Buckner owed Silverhawk a fiduciary-like duty to advise it regarding those exclusions.  *See* Dkt. 66 at 16.  To the extent the Scotts' expert report opines that Buckner had such a duty, the court strikes those portions of the Report as impermissible legal conclusions.  *See, e.g.*, 77-1 at 3 ("Opinions . . . 2.  Buckner failed to satisfy the responsibilities owed to its client, Silverhawk . . . .); *infra* Section (III); *A.E. By & Through Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991) (an expert may not ordinarily "state legal conclusions drawn by applying the law to the facts.").

to feel as if they know less about possible insurance policies than the agents who specialize in procuring insurance." *American Loans*, 2020 WL 1473995, at *5. Thus, if the court adopts the Scotts' argument, "and found that inexperience was enough to impose a special relationship, the exception would swallow the rule and a duty to advise would exist for all but the most sophisticated and experienced clients." *Id.*

*Second*, "an agent holding himself out as knowledgeable about insurance and attentive to the needs of individual insureds . . . [is] insufficient to create any legally meaningful level of entrustment." *Sewell*, 535 F.3d at 1171 (internal quotations omitted). The court finds *Sewell*'s logic persuasive, and it directly forecloses the Scotts' argument that Buckner's "efforts to evaluate its client's coverage needs" through the use of "Contractor Questionnaires [Koszinowksi] created to obtain information pertinent to his clients['] needs" created a special relationship. Dkts. 80 at 19, *id.* at 7 (citing *Asael Farr* generally).[13]

*Third*, assuming arguendo a duty did arise as a result of Silverhawk and Buckner's seven-year relationship, the Scotts' claim still fails because Silverhawk did not reasonably rely on any act or omission by Buckner since it renewed the CGL policy both before and after the alleged Hasleton-Koszinowski conversation, meaning it was

---

[13] But even if a questionnaire sufficed under *Asael Farr* to create a special relationship, the 2007 and 2008 renewal forms indicate that Mr. Koszinowski and Mr. Hasleton "talk[ed] about" the "EIFS" and "subcontractor" work exclusions, that independently preclude coverage. 80-22 at 1, 3, 7.

the *renewed policy that ultimately resulted in the coverage denial*.[14]  So while it was ultimately the 2014–2015 policy that Silverhawk (and the Scotts) found unsatisfactory, Silverhawk renewed the same policy *at least five times* before the alleged Hasleton-Koszinowski conversation and *again* once after.  In other words, Silverhawk had about six years "to review the language of the policy that [Buckner] had secured and to determine whether that policy met all of [their] needs.  Having failed to undertake such a review, [the Scotts] cannot now complain that the insurance was inadequate." *American Loans*, 2020 WL 1473995, at *5.

As the *American Loans* court explained:

> [this] argument is, in many ways, analogous to the reasonable expectations doctrine, which the Utah Supreme Court abolished nearly thirty years ago.  The reasonable expectations doctrine was an equitable power under which a court could revise an existing insurance policy if "the insurer's agent knew or should have known that the insured had expectations that contradicted the policy's language and that the agent created or helped to create those expectations."  See *Allen v. Prudential Prop. & Cas. Ins. Co.*, 839 P.2d 798, 804 (Utah 1992).  But the Utah Supreme Court eliminated this practice because "[t]he theory . . . essentially would allow a court to invalidate a clear provision of an insurance contract, even if the insured had not read it." *Id.*  The same concern applies here: American Loans could have read its policy and learned that it did not cover professional negligence, but it did not do so. Gallagher had no duty to explain this to American Loans.

_____

[14] The Scotts, moreover, do not offer any cases showing that a seven-year relationship is de facto sufficient to find a special relationship.  And the court independently declines to draw that conclusion here where Buckner has proffered evidence unrebutted by the Scotts that this allegedly "special relationship" was at best unilateral since Silverhawk was difficult to obtain renewal information from and was generally disengaged in the yearly renewal process.  Dkt. 80 at 5.

2020 WL 1473995, at *5.   The court likewise concludes that Buckner had no cognizable legal duty relevant to the Scotts' negligent misrepresentation claim.[15]

At bottom, Mr. Koszinowski "may have felt a moral obligation to help his clients, or he may have had a duty imposed upon him by [Buckner] as a condition of employment, but that is not the same as having a duty imposed on insurance agents as a matter of law." *Id*. at 7.  Because no duty existed and because, even if one did, Silverhawk's reliance on Buckner was unreasonable as a matter of law given the multiple renewals of the allegedly deficient policy, Buckner is entitled to summary judgment on this claim.

\* \* \*

For these reasons, Buckner is entitled to summary judgment on the Scotts' assigned claims: Claim 2 (negligent failure to procure), Claim 3 (breach of contract to procure insurance), and Claim 4 (negligent misrepresentation).

---

[15] The Scotts' principal evidentiary support for the existence of a duty is the report from their retained expert, Michael Rodman, who opined that "Buckner's position on how and when clients were personally informed of the key endorsements that excluded coverage, fails to satisfy the responsibility owed its clients . . . ." Dkt. 77-1 at 6.  But Mr. Rodman's "personal opinion that [Buckner] had a 'duty' to explain the differences between various policy options is not evidence of a legal duty to make certain disclosures." *American Loans*, 2020 WL 1473995, at *6 ("The issue of whether a duty exists is entirely a question of law to be determined by the court." (citing *Smith*, 94 P.3d at 923–24))).  Not only is Mr. Rodman's testimony an improper legal conclusion, but it is also insufficient evidence of a legal duty.  In any event, there is record evidence that Mr. Koszinowski *did* advise Mr. Hasleton at least as to the EIFS and subcontractor work exclusions.  Dkt. 80-22 at 3, 7.

### C. Direct Claim for Negligent Misrepresentation

The Court next turns to the Scotts' directly asserted claim for negligent misrepresentation. Before discussing the merits, the court must first determine whether Utah or Colorado substantive law applies.

#### 1. Choice of Law

##### a. Legal Standards

Federal district courts sitting in diversity jurisdiction apply the substantive law—including choice of law—of the forum state. *Kansas Penn Gaming, LLC v. HV Properties of Kansas, LLC*, 662 F.3d 1275, 1284 (10th Cir. 2011). Colorado uses the "most significant relationship" test to determine which state's law applies. *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509–10 (Colo. 2007).

The "most significant relationship" test considers the following contacts: (a) where the injury occurred; (b) where the conduct causing the injury occurred; (c) the domicile, residence, place of incorporation, and principal place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. *Id.* at 510 (citing Restatement (Second) of the Conflicts of Laws (1971) § 145).

Section 148 of the Restatement addresses misrepresentation claims:

> When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Sec. Serv. Fed. Credit Union v. First Am. Mortg. Funding, LLC*, 906 F. Supp. 2d 1108, 1112–13 (D. Colo. 2012).

Comment C to § 148 provides:

In part, because of the difficulties involved in its location, the place of [pecuniary] loss does not play so important a role in the determination of the law governing actions for fraud and misrepresentation as does the place of injury in the case of injuries to persons or to tangible things.

The place where the defendant made his false representations, on the other hand, is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or to tangible things.

*Id.*[16]

Because this analysis applies only to the Scotts' direct negligent misrepresentation claim, the court finds § 148 of the Restatement a useful framework for determining which substantive law to apply. Ultimately, "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue," *Goodyear*, 168 P.3d at 509–10, and neither list is exclusive. *Id.* ("Contacts to be taken into account . . . include" those listed above.); *Security Service Federal Credit Union*, 906 F. Supp. 2d at 1113 ("the factors listed in § 148(2) are not exhaustive and [the court is] free to consider other contacts when determining the choice of law issue.").

With these principles in mind, the court evaluates the Scotts' negligent misrepresentation claim.

### b. Application

Each contact is analyzed below in turn.

### *Place Where Plaintiff Acted in Reliance on Representations*.

When the Scotts both contracted with Silverhawk and secured the loan for the property, they lived in Texas. Dkts. 80-10 at 3; 66-2 at 1. They continued to live in Texas at least until April 2014 (when they obtained a certificate of occupancy) and possibly until December 2014—but in either case they apparently resided in Texas

---

[16] Comment (e) to § 145 further provides "[i]n the case of personal injuries or of injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law." And Comment (f) provides "the place of injury is less significant in the case of fraudulent misrepresentations."

when the subject policy renewed in March 2014.  Dkts. 66 at 7; 80 at 3, 4; 82 at 3; 77-2 at 2.  This factor is neutral as between Colorado or Utah law.

***Place Where Plaintiff Received the Representations.***  The Scotts were living in Houston, Texas before the residence was built.  Accordingly, they appear to have received any "representations" regarding insurance while in Texas.  Dkt. 82-4 at 20:4-6.  This factor is neutral as between Utah and Colorado.

***Place Where Defendant Made the Representations.***  Buckner made the alleged representations in Utah.  This factor is entitled to special weight and favors Utah.  Restatement (Second) of the Conflicts of Laws (1971) § 148 Comment C.

***Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties.***  When the Scotts contracted with Silverhawk they were living in Texas.  Dkt. 82-4 at 20:4-6.  By the time Mid-Continent denied coverage, they appear to have been domiciled in Colorado, though their Colorado residency status is unclear.  Dkt. 77-2 at 1.  Buckner is a Utah corporation with its principal place of business in Utah.  This factor slightly favors Utah.

***The Place Where a Tangible Thing Which is the Subject of the Transaction Between the Parties was Situated at the Time.***  The Scotts' residence is in Colorado.  This factor favors Colorado.

***The Place Where the Plaintiff is to Render Performance Under a Contract Which He Has Been Induced to Enter by the False Representations of the Defendant.***  The contract between Silverhawk and the Scotts—which the Scotts allegedly entered based on Buckner's "representations" regarding CGL

coverage—is governed by Colorado law. Dkt. 66-2 at ¶ 15. The Scotts' payments, however, appear to have occurred periodically throughout the construction process—with at least some occurring before the Scotts moved from Texas to Colorado. *See id.* at ¶ 4; 80-20 at 3 (email dated Aug. 8, 2014, noting "I believe you were diligent about invoicing me . . . I even paid for changes required because of poor planning by Silverhawk."). This factor slightly favors Colorado.

This is a close case. On the one hand, two factors favor applying Colorado law—even if only slightly. On the other hand, two factors favor applying Utah law, including the place where the defendant made the misrepresentations—a factor entitled to particular weight in a negligent misrepresentation analysis. *See Security Service Federal Credit Union*, 906 F. Supp. 2d at 1114 (affirming conclusion that substantive law of the state where the alleged misrepresentations were made applied). Balancing these factors and giving special weight to the place where the alleged misrepresentations were made, the court concludes that Utah law applies to this claim.

### 2. Application of Utah Law to Claim 1 – Direct Negligent Misrepresentation

Buckner is entitled to judgment as a matter of law on the Scotts' direct negligent misrepresentation claim. It is undisputed that Buckner never directly communicated with the Scotts. Rather, this claim depends on alleged misrepresentations and failures to act passed through Silverhawk to the Scotts.

The Scotts cite no Utah law that supports the idea of pass-through liability for allegedly negligent misrepresentations, and the court declines to create one.

34

Moreover, even if such an attenuated theory of liability existed, it would logically require Buckner to be found liable to Silverhawk for the same claim in the first instance, since that exchange was an intermediate link in the chain. But as explained in *supra* (II)(C)(3), it was not.

Thus, Buckner is entitled to summary judgment on the Scotts' Claim 1.

\* \* \*

For all these reasons, Buckner is entitled to summary judgment on all claims for relief asserted by the Scotts.

## III.   Motion to Strike

Finally, the court explains its analysis of Buckner's motion to strike the Scotts' insurance expert, Mr. Rodman, as violative of Fed. R. Evid. 702.

### A. *Legal Standard*

Federal Rule of Evidence 702, which governs the testimony of expert witnesses, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (as amended on Dec. 1, 2023).

Where, as here, a party challenges the admissibility of an expert witness, Rule "702 imposes upon the trial judge an important gate-keeping function with regard to

the admissibility of expert opinions." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation and quotation omitted).  The proponent of expert testimony bears the burden—by a preponderance of evidence—of showing admissibility.  Fed. R. Evid. 702; *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

To evaluate admissibility, the court engages in a "two-step analysis."  *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022).  First, the court must decide whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render the opinion.  Fed. R. Evid. 702; *see also Roe*, 42 F.4th at 1180.  Second, if the expert is sufficiently qualified, the court must determine whether the proffered opinions are reliable.  *Roe*, 42 F.4th at 1180–81.  "The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case."  *Id.* at 1181 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  The court also evaluates whether the expert reliably applied the methodology to the facts of the case.  *Id.*

Experience alone may provide a sufficient foundation for expert testimony, but a witness relying solely on experience must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.  The court's "gatekeeping function requires more than simply taking the expert's word for it."  *Id.* (citation and quotations omitted).

But the court's role as a gatekeeper "is not intended to serve as a replacement for the adversary system." *Id.* (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

The court has substantial discretion to determine "how to perform its gatekeeping function under *Daubert*." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019); *see also Roe*, 42 F.4th at 1180.

### B. Application

The first step of the analysis is determining whether Mr. Rodman has the experience to qualify as an expert. Mr. Rodman has over 50 years of experience in the insurance industry selling, procuring, and analyzing insurance. Dkt. 69-9 at 3. He has authored many articles related to the insurance industry, *id.* at 14, and has testified in 35 insurance cases, none of which he has been disqualified from. *Id.* at 15. The court is satisfied that Mr. Rodman is qualified to testify on insurance industry practices generally.

Buckner's contention that Mr. Rodman is unqualified to testify about insurance industry practices in Utah because he has no specialized Utah expertise is not persuasive. He has been admitted as an expert in eight courts and has provided opinions on the conduct of brokers or agents in fifteen states. Dkt. 77 at 7. Buckner does not offer any persuasive argument that Utah insurance agents are exceptionally

37

unburdened from normal industry practices such that a national expert cannot opine on Utah practices.

The second step of the Rule 702 analysis is determining whether Mr. Rodman's proffered testimony is reliable. Mr. Rodman based his opinion on myriad litigation and discovery documents. Dkt. 69-9 at 9-10. The documents relevant to his testimony include the First Amended Complaint and Buckner's Answer, the insurance policies that Buckner sold to Silverhawk, the General Contract for Services between the Scotts and Silverhawk, the Evidence of Property Insurance issued by Buckner, the deposition transcripts of Mr. Koszinowski and Mr. Hasleton, and copies of the correspondence regarding these insurance policies. *Id.* Mr. Rodman explained that the combination of his experience in the insurance industry and the documents provided to him informed his opinion. The court finds that Mr. Rodman's opinion is reliably based on probative evidence before the court. Accordingly, the court declines to categorically strike Mr. Rodman as a witness.

That said, not all of Mr. Rodman's opinions pass muster under Rule 702: many are improper legal conclusions. *A.E. By and Through Evans*, 936 F.2d at 476 (an expert may not ordinarily "state legal conclusions drawn by applying the law to the facts," as such testimony is typically not helpful to the trier of fact.); *see also Gebremedhin v. Am. Fam. Mut. Ins.*, 2015 WL 4979742, at *6 (D. Colo. Aug. 21, 2015) (applying the above standards and striking challenged portions of expert's report).

For example, Mr. Rodman opines on the responsibilities (*i.e.*, legal duties) that Buckner owed Silverhawk, and further concludes that "Buckner failed to satisfy the

responsibilities owed to its client, Silverhawk . . . ." Dkt. 77-1 at 3. To the extent Mr. Rodman offered opinions such as these—about the level of care owed by Buckner, or its failure to satisfy that level of care or "responsibilities owed to its client"—such testimony is not admissible under Rule 702, and the court disregarded those opinions in arriving at its conclusions.[17]

For the foregoing reasons, Buckner's Motion to Strike is granted in part and denied in part.

## IV.   CONCLUSION

It is ORDERED that:

1. Defendant's Motion for Summary Judgment (Dkt. 66) is GRANTED; and

2. Defendant's Motion to Strike Mr. Rodman (Dkt. 69) is GRANTED in part and DENIED in part.

DATED: May 1, 2024.                    BY THE COURT:

_____
Hon. Timothy M. Tymkovich

---

[17] Providing a line-by-line analysis of Mr. Rodman's reports is unnecessary because the court would otherwise conclude that the reports are inadmissible at trial. *See Live Face On Web, LLC v. Integrity Sols. Grp., Inc.*, 421 F. Supp. 3d 1051 (D. Colo. 2019) ("This Court, generally, does not admit expert reports or portions of those reports into evidence due to the fact that they are rife with hearsay."); *see also Nat'l Indem. Co. v. Nelson, Chipman & Burt*, 2013 WL 12303138, at *1 (D. Utah Jan. 22, 2013) (a "report is not evidence admissible at trial"). And for the same reasons and concerns about legal conclusions set forth in this section, the court has not considered the testimony of Buckner's experts Terry Buckner nor Barbara Berrett. *See* Dkt. 77 at 7, fn. 3.